UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15CR229 HEA/NCC |
| | ) | |
| TADAR M. BAHAR, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM AND REPORT AND RECOMMENDATION
# OF UNITED STATES MAGISTRATE JUDGE

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

Defendant Tadar Bahar filed Defendant's Motion To Suppress Evidence on July 30, 2015 (Doc. 90). The government filed a Response To Defendant's Motion To Suppress Evidence under seal on August 6, 2015 (Doc. 93).[1] The court held a hearing on Bahar's motion on January 26, 2016. The government presented the testimony of three law enforcement witnesses. Defendant Bahar also testified. At the conclusion of the hearing, the undersigned ordered that post-hearing briefs be filed after the government argued that it should be allowed additional cross examine of defendant over his objections, which were sustained by the court. Thereafter, the parties informed the court that post hearing briefs would not be filed and the government would not seek to reopen the hearing. The court ordered that a copy of the evidentiary hearing

---

[1] The government's Response makes reference to other individuals who cooperated with its investigation. The parties did not request that any portion of the evidentiary hearing be sealed. Nevertheless, this Memorandum, Report and Recommendation will not refer to any such individuals by name other than Defendant Bahar.

transcript be prepared to assist the court in making findings of fact and conclusions of law. The transcript was filed on February 22, 2016.

Based on the evidence and testimony adduced, as well as a review of the transcript of the hearing in this matter; and having had an opportunity to evaluate the credibility of the witnesses and observe their behavior, the undersigned makes the following findings of fact and conclusions of law.

**Findings of Fact**

On February 12, 2015, at approximately 11:30AM, Officers Victor Donte White and Kale Pirtle with the Metro East Drug Task Force ("Task Force") conducted a traffic stop of a car driven by Defendant Tadar Bahar along Interstate Highway 55 in southern Illinois. Bahar was driving in the southbound lanes, heading in the direction of Saint Louis, Missouri. The officers drove separate vehicles. TFO White, who is a police officer with the City of East Saint Louis, Illinois and assigned to the Task Force, testified that he approached the Toyota RAV4 and explained that he observed Bahar speeding and following a truck too closely. When asked the purpose of his travel, Bahar told TFO White that he was driving to Saint Louis to meet a woman at a local restaurant and that he would be staying for the weekend. TFO White saw no luggage in the passenger compartments of the Toyota RAV4, and he confirmed with Bahar that he did not bring a change of clothes. TFO White thought it was strange for Bahar to plan to stay the weekend in Saint Louis with no luggage. TFO White obtained Bahar's driver's licence and registration and ran a records check in his police vehicle while Bahar stayed in the Toyota RAV4.

TFO White determined that Bahar's license was valid and that he had a prior arrest for possession of a controlled substance and theft. TFO White returned to the Toyota RAV4 with

2

Bahar's license and registration, along with a partially-completed form seeking consent to search. TFO White presented the consent form to Bahar. TFO White noticed that Bahar was nervous and was speaking rapidly and breathing heavily, even after he explained that he was going to issue warnings to Bahar for the traffic violations rather than citations. Bahar declined to consent to search. TFO White decided to ask TFO Pirtle to conduct a dog sniff around the Toyota RAV4. TFO White estimated that approximately 10 minutes elapsed between the initial traffic stop and the issuance of the warnings.

TFO White testified that the traffic stop of Bahar was not random. The government's witnesses testified that the Toyota RAV4 was identified after a series of events involving the arrest of another person who was cooperating with the investigation ("CI"). Saint Louis Metropolitan Police Officer Brian Seppi testified that the CI was arrested previously with heroin and U.S. currency, and he identified Bahar as a drug source to the special agents with the Saint Louis office of the Drug Enforcement Administration ("DEA").

Earlier during the day on February 12, 2015, at approximately 10:00AM, the CI told DEA special agents that Bahar was traveling to Saint Louis from Chicago in a Toyota RAV4 with heroin contained in a hidden compartment. Bahar was reported to be two hours outside St. Louis. DEA contacted the Task Force and relayed that Bahar was traveling in the Toyota RAV4 with heroin and they gave his estimated time of arrival through that part of southern Illinois. TFO Seppi explained that DEA asked the Task Force to conduct the traffic stop to avoid revealing to Bahar that a larger federal investigation was ongoing. Seppi also testified that the CI information about Bahar began with earlier communications to DEA before February 12, 2015.

TFO Seppi, who is assigned to the Saint Louis office of the DEA, explained that the CI told DEA Special Agent Steven Hofer, on January 21, 2015, that he and Bahar were to meet in the Central West End neighborhood of Saint Louis and Bahar would have narcotics with him. Agents did not assemble in time to observe the meeting, but they did see Bahar drive a silver Toyota RAV4 with Illinois license plates around Saint Louis after the meeting. DEA took note of the vehicle license plate numbers. TFO Seppi also saw the CI's vehicle traveling with the Toyota RAV4, which was driven by Bahar. DEA agents followed Bahar to several local hotels where he entered the main lobby and exited after a few minutes. They discontinued surveillance when Bahar did not return to the Toyota RAV4 after 45 minutes inside the third local hotel he entered. TFO Seppi explained that investigators expected that Bahar would likely return to Saint Louis on another date to continue his alleged drug trafficking with the CI.

TFO Seppi further testified that he was familiar with the CI even before January 21, 2015 because he arrested the CI on October 30, 2014[2] with three kilograms of heroin. Thereafter, the CI and his lawyer agreed to meet with DEA, cooperate with the investigation and reveal his sources of supply. On December 9, 2014, the CI named "Big Boy," as his Chicago heroin source. DEA and the CI agreed that he would attempt to arrange a meeting so that agents could identify "Big Boy." Later, the CI told DEA that he planned to meet with Bahar on January 21, 2015 as described above.

The DEA investigation continued on January 26, 2015. TFO Seppi testified that a different confidential source ("CS") told DEA that the CI recently obtained seven kilograms of heroin from his out-of-town source of supply in Saint Louis, without agents' permission. Apparently, the CI did not know that the CS was cooperating with agents. The CI told the CS

---

[2] TFO Seppi did not testify to the date of the CI's arrest. The date was included in the government's Response (Doc. 93), and is not disputed by Bahar.

4

that his source for the seven kilograms of heroin was from Chicago. The CI also told the CS that he arranged for his Chicago source to "front" him the seven kilograms of heroin without immediate payment. The CI told the CS that he planned to wait to distribute the seven kilograms of heroin and that he would use a middle man for the transactions. The CS also said that the CI did not intend to pay his Chicago source, and that the CI left his source in possession of one kilogram of heroin. TFO Seppi testified that investigators believed that the CI planned that Bahar's possible arrest, with a kilogram of heroin, would mean that he would not have to pay Bahar for the seven kilograms of heroin he obtained a few days earlier. The CS also explained that the CI was frustrated that DEA special agents did not stop Bahar with heroin on January 21, 2015 when the two met in Saint Louis on that date.

On cross examination, TFO Seppi acknowledged that the CI lied to the DEA and violated his cooperation agreement by arranging the alleged seven-kilogram heroin deal with Bahar in secret. TFO Seppi also testified that the street value of seven kilograms of heroin was approximately $490,000. Defense counsel called into question agents' reliance on the CI as a basis to stop Bahar on February 12, 2015 when they knew that the CI lied previously. TFO Seppi testified on redirect that agents found the CI's information to be credible, in part, because agents previously seized $270,000 from a rental car driven by the CI, and he was arrested with three kilograms of heroin on October 30, 2014. The CI told DEA that the $270,000 was for the purchase of a large quantity of heroin. Thus, DEA agents believed that Bahar was traveling to Saint Louis on or about February 12, 2015 to meet the CI to further the drug trafficking between them based on all that information. TFO Seppi explained that Special Agent Hofer relayed the vehicle and license information to the Task Force, along with the information about suspected narcotics in a hidden compartment, prior to the traffic stop of the Toyota RAV4 on February 12,

5

2015. TFO White testified that he had the information from DEA that Bahar was traveling through southern Illinois with suspected narcotics when he saw the Toyota RAV4 on Interstate 55.

As discussed above, Bahar declined to give consent to search when given the form by TFO White. TFO White told him that he would ask TFO Pirtle to conduct a canine sniff around the vehicle. TFO Pirtle was already present on the scene as the assisting officer. The officers could not recall in their testimony whether Bahar stood at the side of the road while the canine worked or if he was seated in the police vehicle.

TFO Pirtle is an experience dog handler. Officer Pirtle is a police officer with the Village of Caseyville, Illinois and he is a DEA Task Force Officer. TFO Pirtle testified that his canine partner, Dallas, has attended a two-week Positive Response training course in Jackson, Tennessee sponsored by an individual identified as Mark Robertson. Dallas was previously trained by Robertson. Dallas and TFO Pirtle also train twice monthly at the K-9 East/West training program. They have worked together for nearly a year and four months. The government did not offer exhibits regarding Dallas or his training.

TFO Pirtle testified that Dallas is a narcotics detection dog who indicates aggressively the presence of narcotics odor by scratching at the source of the odor. On February 12, 2015, TFO Pirtle and Dallas started at the front driver's side of the Toyota RAV4. TFO Pirtle gave Dallas a command which is to "find dope." TFO Pirtle recorded the time the dog search began at 11:38AM. TFO Pirtle and Dallas walked toward the rear driver's side of the wheel well. Officer Pirtle testified that Dallas began breathing quickly and he used a fast head turn toward the driver's side rear wheel well. The search concluded about ten seconds later when Dallas wagged his tail and scratched at the wheel well, which is his trained response to narcotics odor.

On cross examination, TFO White testified that Dallas searched outside the Toyota RAV4. TFO White told Bahar the results of the dog's sniff and positive indication. Bahar appeared to be nervous. Bahar said that he had no knowledge of drugs in his car but that his son might have smoked marijuana inside the Toyota RAV4. Thereafter, an officer escorted Bahar to the back of TFO Pirtle's police vehicle and secured him in the back seat. Officers conducted an initial search of the Toyota RAV4 at the side of the highway. On cross examination, TFO White testified that the secured area in the back of the unmarked police vehicle is fashioned like a small holding cell and he acknowledged that Bahar is a large man.

At approximately 11:50AM, TFOs White and Pirtle ended the roadside search of the car when they decided the location was too dangerous a place to continue. Task Force officers drove the Toyota RAV4 and Behar separately to an automotive repair center in Collinsville, Illinois. The vehicle search continued with other law enforcement present. Bahar also testified that he remained confined to TFO Pirtle's vehicle at the repair shop. TFO White testified that officers located a hidden compartment underneath the backseat cargo area of the Toyota RAV4, which was activated by a mechanical device. The metal did not appear to be factory installed and officers pried it open with a crowbar. At approximately 12:15PM, the Task Force officers found inside it a quantity of heroin shaped like a brick that was wrapped in plastic and tape.

Bahar testified[3] that the traffic stop occurred sometime between 11AM and 11:30AM. Bahar disputed at the scene that he was speeding. He testified that he was attempting to get out of the way of TFO White's unmarked SUV as it approached him in the left lane of the highway. When asked on direct examination about the police canine, Bahar testified that TFO Pirtle and

---

[3] Bahar also testified to statements he made to Task Force officers. The government is not seeking to enter his statements at trial and there is no motion to suppress statements before this court, so no findings are made on those matters.

Dallas walked around the Toyota RAV4 and TFO Pirtle opened its door. He said that Dallas jumped inside, spun around and jumped out. Bahar acknowledged that he is not a trained narcotics officer but he has seen dog searches on television and Dallas did not scratch at the Toyota RAV4. On cross examination, Bahar testified that he was able to see the entire search and he saw two officers search the Toyota RAV4 while one officer walked around with the dog.[4]

Bahar further testified that he sat stationary in the back seat of a police vehicle for approximately 20 to 25 minutes watching the officers search roadside. TFO White then drove him to a location that he believed to be a car dealership, although he was not sure because he could only see in a forward direction. During the car ride, Bahar testified that he told TFO White that his son smoked marijuana in the Toyota RAV4 and Bahar could still smell the lingering aroma.

Bahar testified that after the Task Force arrived at the automobile repair center and continued the vehicle search, TFO White returned to Bahar and further engaged him in conversation by asking him to reveal the location of the drugs. Bahar did not make any admissions. He testified that he sat in the back of a police vehicle for at least an hour during the search at the repair shop, and that the entire traffic stop took between 1 hour 40 minutes to two hours.

After he was arrested and during transport to Saint Louis, Bahar testified that he observed that the spare tire previously affixed to the back door of the Toyoto RAV4 was removed.

---

[4] The record is not clear whether Bahar observed two officers search the Toyota RAV4 while at the same time Dallas conducted his free air sniff around the vehicle. However, the undersigned notes that Bahar's Motion To Suppress does not make this argument.

## Discussion

A. **The Traffic Stop And Police Inquiries**

"A traffic stop is considered a seizure for Fourth Amendment purposes." United States v. Guevara, 731 F.3d 824, 827 (8th Cir. 2013). In order to justify the seizure, the stop must be "supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred," and the police must "objectively ha[ve] a reasonable basis for believing that the driver has breached a traffic law." United States v. Washington, 455 F.3d 824, 826 (8th Cir. 2006). The Eighth Circuit has repeatedly held that "[a] traffic violation—however minor—creates probable cause to stop the driver of a vehicle." United States v. Wright, 512 F.3d 466, 471 (8th Cir. 2008) (quoting United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc)). United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004). The government bears the burden of establishing that probable cause existed. United States v. Andrews, 454 F.3d 919, 922 (8th Cir. 2006).

TFO White observed defendant's Toyota RAV4 speeding and following a truck too closely and, for this reason, he had probable cause to initiate a traffic stop. United States v. Brown, 345 F.3d 574, 578–80 (8th Cir. 2003); United States v. Linkous, 285 F.3d 716, 719–20 (8th Cir. 2002). Bahar disputes that he was speeding but he does not dispute that he was following a truck too closely. Once TFO White made the traffic stop, he was authorized to check the driver's license and the vehicle's registration, conduct computer searches relating to criminal history, make inquiries about the trip and its purpose, and detain a defendant as long as reasonably necessary to conduct these activities and to issue a warning or citation. United States v. Quintana, 623 F.3d 1237, 1239 (8th Cir. 2010) (quoting United States v. Jones, 269 F.3d 919, 924–25 (8th Cir. 2001)). Factors such as a driver going to meet a woman for the weekend with

no discernable luggage in the vehicle---and the driver's confirmation that he had no change of clothes---may justify expanding the scope of the traffic stop and further detention of the vehicle's occupant. Such was the case here. Officer White issued warnings. He completed a section of a written consent to search form that he presented to Bahar for his signature; and he had credible information from DEA agents that Bahar was traveling with narcotics. Therefore, his decision to conduct the traffic stop was reasonable under the circumstances. The stop was of reasonable length and it was based on probable cause for the traffic violations.

**B.     Detention Of The Toyota RAV4 To Conduct A Drug-Detection Dog Sniff**

Bahar argues that the officers improperly delayed his travel, and they did not have a sufficient factual basis to support a reasonable suspicion of wrongdoing to deploy a drug-detection dog.

An investigative Terry-type stop is proper if a police officer "has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." United States v. Vinson, 805 F.3d 1150 (8th Cir. 2015) (quoting United States v. Roberts, 787 F.3d 1204, 1209 (8th Cir. 2015) (internal quotation marks omitted)). The officer need only "articulate some minimal, objective justification for an investigatory stop" in order to comply with the Fourth Amendment. United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).

Specifically, TFO White observed Bahar's continued nervousness, even though the officer told him he would be issued warnings and not citations for the traffic violations. TFO White also considered that Bahar did not travel with luggage for a weekend trip to meet a woman. Bahar had a prior arrest for drug possession and TFO White had information from the DEA about his possible possession of narcotics. All of this created a sufficient basis to expand

the scope of the stop because defendant may have been transporting drugs. See United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993) ("[I]f the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions."). Any "subsequent questions represented a minimally intrusive way of addressing his reasonable suspicion; asking them did not, therefore, constitute an unreasonably prolonged detention." Donnelly, 475 F.3d at 953.

Because TFO White observed Bahar's continued nervousness, and he had reliable information from DEA agents, along with the suspicious statement about a weekend trip without luggage, this case does not implicate the Supreme Court's ruling in Rodriguez v. United States, --- U.S. ----, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015). In Rodriguez, the Supreme Court resolved a split among lower courts and reversed longstanding Eighth Circuit precedent that allowed the police to extend a stop and conduct dog sniffs without additional reasonable suspicion so long as it was a short delay and, therefore, a *de minimus* intrusion on a defendant's personal liberty. Id. at 1616. The Court clarified that a police extension of a traffic stop in order to conduct a dog sniff was not constitutionally permissible unless the police had reasonable suspicion to do so. Here, the Task Force possessed the reasonable suspicion necessary to justify the deployment of the canine unit to sniff around the vehicle, which was done right away because the dog and his handler were already on the scene.

To the extent that Bahar generally disputes the timeline of events put forward by the government's witnesses, Bahar's testimony of his recollection of the passing time is without specifics or benchmarks. By contrast, TFO Pirtle testified to his regular practice of recording the time every occasion that Dallas began a free air search. TFO Pirtle testified that Dallas indicated the presence of drugs within 10 seconds. TFO White testified that the distance between the

11

roadside stop and the auto repair shop in Collinsville, Illinois was approximately a 10-minute drive. The officers also testified that the roadside search was termed for officer safety. Officers also memorialized the time that the heroin was found to be approximately 12:15PM, which means that around 45 minutes elapsed from the traffic stop to the time of arrest. Therefore, it is unlikely that the Task Force would have remained at the edge of the interstate highway for the longer length of time Bahar recalls, given their plan to move the Toyota RAV4 to a secure location and to search for a hidden compartment.

  **C.  Drug-Detection Dog's Indication of Drugs and Probable Cause To Search Bahar's Toyota RAV4**

  Bahar does not directly challenge the reliability of TFO Pirtle's police canine, Dallas. Rather, he suggests in his motion to suppress that Dallas, as a factual matter, failed to indicate to any narcotics odor during several passes of the Toyota RAV4. This argument is not supported by the record.

  TFO Pirtle testified to Dallas' ongoing training regime and certifications. He described the dog's aggressive indication on the Toyota RAV4 to be reliable and consistent with their continued training together and the dog's experience to recognize the odor of narcotics. The witness's testimony established sufficient reason for TFO Pirtle to trust Dallas' indication of narcotics odor. Moreover, Bahar testified that *he* could smell the lingering odor of marijuana in the Toyota RAV4 and he discussed this with TFO White. None of the government's witnesses said they smelled the odor of marijuana. However, had the officers noticed such a smell, the Supreme Court has recognized that the odor of an illegal drug can be highly probative in establishing probable cause for a search. United States v. Caves, 890 F.2d 87, 90 (8th Cir. 1989), citing Johnson v. United States, 333 U.S. 10, 13 (1948) (observing that the odor of an illegal substance testified to by a qualified affiant "might very well be found to be evidence of a most

persuasive character"). Regardless, Bahar's testimony about his untrained observations of Dallas at work are not supported by the record.

The Supreme Court has refined the dog sniff reliability test. See generally Florida v. Harris, ––– U.S. ––––, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013). A dog's training and certification to detect drugs provides "facial validity" in his reliability. Id.

> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant, as the Solicitor General acknowledged at oral argument. See Tr. of Oral Arg. 23–24 ("[T]he defendant can ask the handler, if the handler is on the stand, about field performance, and then the court can give that answer whatever weight is appropriate"). And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.
>
> ….
>
> The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

Id. at 1057-58. The Court rejected the notion that the government must introduce field-performance records to establish that a dog's alert provided probable cause, id. at 1056, concluding instead that "a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." Id. at 1057. Although acknowledging that a drug dog's performance in the field "may sometimes be relevant," id. at 1057, the Court expressed doubt about the significance of field performance records.

13

In this case, the canine's ongoing training is regular and consistent. There is no evidence that TFO Pirtle cued the dog or that Dallas expected a reward upon the indication. Therefore, the facts of this case meet the Supreme Court's probable cause test of a dog's reliability established in Florida v. Harris. An "indication by a properly trained and reliable drug dog provides probable cause for ... the search of a vehicle." United States v. Winters, 600 F.3d 963, 967 (8th Cir. 2010). Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present. United States v. Alexander, 448 F.3d 1014, 1017 (8th Cir. 2006); United States v. Sundby, 186 F.3d 873, 875–76 (8th Cir. 1999). Accordingly, Officers White and Pirtle had probable cause to search Bahar's car pursuant to the automobile exception to the warrant requirement.

### D. The Search of Bahar's Toyota RAV4

Under the automobile exception to the warrant requirement, an officer with probable cause to search a vehicle may search any item within that vehicle that is capable of containing the object of the search, regardless of whether the item belongs to the driver, passenger, or someone else. Wyoming v. Houghton, 526 U.S. 295, 307 (1999). "If probable cause justifies the search of lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 825 (1982). See also United States v. Brown, 634 F.3d 435 (8th Cir. 2010).

The Eighth Circuit has noted that the "automobile exception" permits the warrantless search of a vehicle if the police "had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began." United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003). If the automobile exception applies, the vehicle need not be searched

14

immediately. United States v. Castaneda, 438 F.3d 891, 894 (8th Cir. 2006). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005). In making the probable-cause determination, we "apply a common sense approach and consider all relevant circumstances." Id.

The Task Force had probable cause to search the Toyota RAV4 because the DEA passed along reliable information about Bahar that led to the canine Dallas' positive indication that the odor of narcotics was present. Accordingly, officers did not need a warrant to search the vehicle.

### E. Defendant's Arrest

The Eighth Circuit has ruled that whether officers make a formal arrest or a detention ripens into an arrest, "[a] warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause." Guevara, 731 F.3d at 832; quoting Ulrich v. Pope Cnty., 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting Borgman v. Kedley, 646 F.3d 518, 522–23 (8th Cir. 2011)); see also Martinez, 462 F.3d at 907, 910 (holding in the alternative that even if handcuffing a suspect did convert the detention into an arrest, the arrest was justified by probable cause). "Probable cause to make a warrantless arrest exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" Ulrich, 715 F.3d at 1059 (quoting Borgman, 646 F.3d at 523).

TFO White had probable cause to arrest defendant based on the totality of the circumstances and the seizure of heroin. Therefore, his arrest was valid.

## Conclusion

For all of the foregoing reasons, it is recommended that defendant's Motion to Suppress Evidence should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion To Suppress Evidence (Doc. 90) be **DENIED**.

The parties are advised that they have fourteen (14) days to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to timely file objections may result in the waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

**IT IS FURTHER ORDERED** that this cause has been set for trial before United States District Judge Henry E. Autrey on **Monday, April 18, 2016, at 9:30 a.m.**

                                             /s/Noelle C. Collins
                                             United States Magistrate Judge

Dated this 17th day of March, 2016.